**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

In re

Tilden Marcellus, LLC,

Debtor.[1]

Chapter 11

Case No. 22-20212-GLT

**DECLARATION OF JEFFREY T. VARSALONE**
**IN SUPPORT OF FIRST DAY RELIEF**

I, Jeffrey T. Varsalone, hereby declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned debtor and debtor in possession (the "Debtor"). I have held this position since February 12, 2021, when the Debtor engaged G2 Capital Advisors, LLC ("G2") to provide restructuring advisory services.

2.      I am a Managing Director at G2 with over 20 years of experience in distressed transactions, including restructuring, turnaround, workouts, going-concern asset sales, and representing various stakeholders and parties in interest in in- and out-of-court restructurings and chapter 11 bankruptcies. I routinely serve as a CRO, assist clients with liquidity solutions, assess business plan viability, structure plans of reorganization and conduct recapitalization and asset sale processes.

3.      As a result of my tenure as CRO for the Debtor and my restructuring experience, my review of public and non-public documents, and my discussions with Debtor's management, I have become reasonably familiar with the Debtor's business, day-to-day

---

[1]      The last four digits of the Debtor's federal tax identification number are 9352. The Debtor's principal place of business is located at 4600 J Barry Ct., Suite 320, Canonsburg, PA 15317.

operations, financial affairs and books and records.  Except as otherwise indicated, the statements

set forth in this declaration are based upon my personal knowledge of the Debtor's operations and

financing, information learned from my review of relevant documents, information supplied to me

from other members of the Debtor's management or the Debtor's advisors, or my opinion based

on my knowledge, experience and information concerning the Debtor's operations and financial

condition.  I am authorized to submit this declaration on behalf of the Debtor.  If called to testify,

I could and would testify competently to the matters set forth in this declaration.

4.        On February 4, 2022 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in this

Court.  The Debtor continues to operate its business on a limited basis and manage its affairs in

the ordinary course of business as a debtor in possession.  The Debtor has filed a number of

motions identified herein requesting "first day" relief.  I submit this declaration in support of such

first day relief, as well as to provide support for, and background concerning, the Debtor's chapter

11 case (this "Chapter 11 Case") and other pleadings filed or expected to be filed in the case.

## INTRODUCTION

5.        The Debtor is a gas exploration and production company whose operations

involve the capture and sale of dry natural gas.  Through oil and gas leases entered into with oil

and gas rights owners, the Debtor holds working interests and revenue interests in gas properties

that give it the right to drill, produce, shut-in and maintain wells in the counties of Potter and Tioga,

Pennsylvania.  The Debtor's gas interests comprise approximately 375 oil and gas leases and the

Debtor holds interests in approximately 50 previously operated wells in Potter and Tioga.

6.        The Debtor is party to a long-term gas gathering agreement (the "UGI

Agreement") with UGI Texas Creek, LLC ("UGI") which governs how the Debtor's gas is

gathered and transported from wellhead to market.  UGI owns the pipelines, or gathering system (the "Gathering System"), through which the Debtor's gas is transported.  The UGI Agreement requires, among other obligations, certain minimum volume commitments ("MVCs") that are fixed by contract notwithstanding fluctuations in commodity prices or the amount of gas flowing through the pipeline.  The UGI Agreement also includes "dedication" commitments which seriously limit the Debtor's ability to operate with an alternative midstream services provider or market its assets to potential buyers.

7.     Shortly after its inception, the Debtor struggled to meet production projections because certain of the Debtor's wells underperformed and the Debtor was unable to drill additional wells.  Given this production shortfall, the Debtor could not produce enough gas to meet its MVCs under the UGI Agreement.  Moreover, starting in 2019 and carrying through 2020, gas prices underwent a sustained depression.  This prolonged dip in gas prices made it increasingly difficult for the Debtor to meet its contractual obligations, particularly its fixed obligations under the UGI Agreement.

8.     Taken together, the underperformance of certain of the Debtor's wells, the lack of drilling capital for additional wells, the fixed terms of the UGI Agreement, and the depression in gas commodity prices have jeopardized the sustainability of the Debtor's business.  In light of these difficult circumstances, the continued production of natural gas became unprofitable for the Debtor.  As a result, on June 30, 2021 the Debtor was compelled to shut-in all but one of its wells and cease substantially all its operations.

9.     Given these challenges, the Debtor has also faced severe liquidity constraints for over a year.  The Debtor and its parent, Tilden Holdings (as defined below), failed to meet their commitments under the senior secured Prepetition Credit Facility (as defined below) to raise post-closing equity capital in connection with the purchase of its leases and wells

(discussed below).   The Debtor has also been unable to pay interest that has accrued since November 2020 in addition to other amounts owing under the Prepetition Credit Facility, which, along with other circumstances, has led to the occurrence of numerous events of default thereunder. As a consequence of the events of default, the Prepetition Credit Facility Secured Parties (as defined below) exercised certain rights under the Prepetition Credit Facility to install an independent manager for the Debtor, leading ultimately to my appointment as CRO.

10.     Beginning in April 2021, the Debtor has also sought and obtained additional "rescue" financing from the Prepetition Credit Facility Secured Parties, in the form of Protective Advances (as defined in the Prepetition Credit Agreement), in order to pursue strategic alternatives and an orderly chapter 11 filing, rather than face a premature and potentially value-destructive liquidation.  Between April 29, 2021 and the Petition Date, the Prepetition Credit Facility Secured Parties have provided five Protective Advances in the aggregate initial principal amount of $2,300,000.

11.     In an effort to restart the Debtor's operations in a profitable manner and to take advantage of recent (and potential future) improvements in natural gas prices, the Debtor, along with its advisors, pursued strategic and operational out-of-court and in-court solutions, including renegotiating the UGI Agreement and, in consultation with the Prepetition Credit Facility Secured Parties, a chapter 11 filing and reorganization.

12.     These negotiations led to two key arrangements that, together, provide the roadmap for this Chapter 11 Case.

13.     *First*, the Debtor has determined to pursue a marketing process for bids to sell substantially all the Debtor's assets under Section 363 of the Bankruptcy Code or reorganize the Debtor through a plan of reorganization (the "Restructuring Transaction").  The Prepetition Credit Facility Secured Parties have expressed support for the Debtor's efforts to pursue the Restructuring Transaction and as discussed herein, have agreed to provide capital to support such efforts, both through the Protective Advances already provided to the Debtor and the DIP Financing (as defined below).  To gain Court approval of these transactions, contemporaneously

4

herewith the Debtor has filed the DIP Motion (as defined below) and motion for approval of bidding procedures and a 363 sale for substantially all the Debtor's assets.

14.     *Second*, following extensive negotiations with UGI, on February 4, 2022, the Debtor and UGI entered into that certain binding term sheet (the "Term Sheet") that modifies the terms of the UGI Agreement through the closing of the Restructuring Transaction.[2]  The Term Sheet modifies certain terms of the UGI Agreement on a temporary basis to allow the Debtor to restart operations, providing much-needed cash flow during this Chapter 11 Case.  The Term Sheet also provides, subject to certain qualifications, that UGI will serve as a consultation party in connection with the sale of the Debtor's assets.  To ensure the enforceability of the Term Sheet during this Chapter 11 Case, contemporaneously herewith the Debtor has filed a motion to approve its entry into and performance under the Term Sheet.

15.     Through the Restructuring Transaction, the Debtor plans to sell substantially all its assets or emerge from bankruptcy as a reorganized, appropriately capitalized business enterprise with a manageable gas gathering agreement.  The Debtor has determined in its business judgement that pursuing the Restructuring Transaction is in the best interests of creditors, the estate, and all stakeholders.

16.     To familiarize the Bankruptcy Court with the Debtor, its business, the circumstances leading to this Chapter 11 Case, and the first day relief that the Debtor is seeking, I have organized the First Day Declaration as follows:

- **Part I** provides an overview of the Debtor's organizational structure, its business, and its capital structure;

- **Part II** describes the circumstances leading to this chapter 11 case;

- **Part III** summarizes the Debtor's strategy in this Chapter 11 Case and provides the evidentiary support for the relief requested in each of the first day pleadings.

---

[2]     To modify the UGI Agreement on a go-forward basis after the closing of the Restructuring Transaction, in connection with the sale UGI will negotiate material amendments to the UGI Agreement with the Debtor and/or potential bidders in formulating their bids, which may be amended, assumed by the Debtor, and assigned to the successful bidder.

# I.   OVERVIEW OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS

## A.   The Debtor's Organizational Structure and Governance

17.   The Debtor is a Texas limited liability company with its principal place of business in Canonsburg, Pennsylvania, and is a wholly owned subsidiary of Tilden Marcellus Holdings, LLC ("Tilden Holdings"), also a Texas limited liability company. Tilden Resources, LLC, a Texas limited liability company, holds 100% of the common units of Tilden Holdings and certain investors hold 100% of the preferred units of Tilden Holdings. The Debtor wholly owns Green Valley Midstream LLC ("Green Valley"), a Texas limited liability company. Green Valley is not a debtor, transacts no business, and holds no assets. The Debtor's organizational structure is as follows:



18.   Historically, the Debtor's governance, management and operations have been controlled by Tilden Holdings. However, following the occurrence of certain defaults under the Prepetition Credit Agreement, the rights of Tilden Holdings (as the owner of 100% of the common units of Tilden) to vote its common units to appoint a manager of Tilden under Tilden's operating agreement vested in the Prepetition Credit Facility Secured Parties, in accordance with the terms of the that certain Pledge and Security Agreement, dated February 28, 2019. The Prepetition Agent (as defined below), acting on behalf of the Prepetition Credit Facility Secured Parties, exercised such voting rights to appoint Samuel W. Humphreys (the "Manager") on January 28, 2021, who has been and remains the Debtor's sole, independent manager to date. The Manager retained the services of G2 and authorized my appointment as CRO on February 12, 2021.

## B.    The Debtor's Business and Operations

19.    The Debtor is a privately held gas exploration and production company whose operations involve the capture and sale of dry natural gas.  The Debtor maintains offices in Houston, Texas and Canonsburg, Pennsylvania, and production operations in the Pennsylvania counties of Potter and Tioga.

20.    On February 15, 2019, Tilden acquired from SWEPI, LP certain working interests in more than 27,000 net leasehold acres, including 50 natural gas wells (the "Marshland Assets"), and the Gathering System in Potter and Tioga counties, Pennsylvania for a purchase price of $44,058,968.25.  As part of the funding of the purchase, concurrently therewith the Debtor sold to UGI the Gathering System—and the attendant easements, rights of way, records, and permits necessary to operate the Gathering System—for a purchase price of $20 million.  As part of this transaction, the Debtor and UGI also entered into the UGI Agreement.

21.    Pursuant to the UGI Agreement, a 20-year term contract, UGI provides gas gathering services to the Debtor.[3]  The UGI Agreement obligates the Debtor to deliver to UGI fixed and determinable quantities of natural gas each month for the first ten years of the contract and obligates UGI to provide the Debtor pipeline capacity to flow the Debtor's natural gas through its Gathering System and to redeliver the natural gas to market.

22.    As of the Petition Date, all but one of the Debtor's wells are connected to UGI's Gathering System.  The Debtor's sole well not connected to UGI's Gathering System is connected to a pipeline that it wholly owns.  This well is still operational and in January, the production month immediately preceding the Petition Date, yielded gross revenues of approximately $40,000.00.

---

[3]    Any summary of an agreement in this First Day Declaration is a reference to such agreement as amended, supplemented, or otherwise modified from time to time and is for the convenience of the Court and the parties in interest in this chapter 11 case and is qualified in its entirety by the terms of such agreement.

23.     The Debtor is also party to a variety of gas gathering, transportation, and similar midstream services to (a) source and deliver fresh water to the wellhead, and (b) gather produced water from the wellhead and dispose of the same.

24.     The Debtor outsources all functions of asset management to, and leases employees from, Energy Operating Corp. ("Energy OpCo," f/k/a Tilden Management Services, Inc.) pursuant to that certain *Management Services Agreement*, dated February 28, 2019, and that certain *Employee Leasing Agreement*, dated March 1, 2019.  Energy Opco also manages the assets of Rockdale Marcellus, LLC ("Rockdale").  Rockdale and the Debtor allocate amongst each other certain costs and expenses and share in common some employees and management provided by Energy Opco.[4]  All employees and executives necessary for the Debtor's operations are provided by or contracted through Energy OpCo.

25.     Once gathered and transported, produced gas from the Debtor's operated wells is sold under short-term market-priced agreements with various purchasers. Because the Debtor's natural gas production from its operated properties is sold under market-priced agreements, the Debtor is positioned to take advantage of a future increase in natural gas prices, but is also subject to any future price declines.

26.     To achieve more predictable cash flow and reduce its exposure to adverse fluctuations in commodity prices, the Debtor periodically enters into commodity derivative arrangements, or "hedging arrangements," for its natural gas production.  By removing a significant portion of price volatility associated with its natural gas production, the Debtor believes it is able to mitigate, but not eliminate, the potential negative effects of reductions in natural gas prices on its cash flow from operations for the periods covered under hedging arrangements.  The Debtor realizes gains on the derivatives to the extent the hedging contract prices are higher than market prices.  In certain circumstances, where the Debtor has unrealized gains in its hedging

---

[4]     Rockdale currently has a chapter 11 case pending in this Court, Case No. 21-22080.  Given the shared management and employees, certain vendors of Rockdale and the Debtor have treated them as a single business enterprise.

portfolio, it may choose to restructure existing derivative contracts or enter into new transactions to modify the terms of current contracts in order to realize the current value of its existing position.

### C.    The Debtor's Capital Structure

27.    The Debtor funded the acquisition and development of the Marshland Assets through approximately $32.0 million in debt financing, $20.0 million from the concurrent sale of the Gathering System to UGI, and $3.0 million in equity financing in Tilden Holdings (with subsequent equity financing raised post-closing).[5]

28.    As of the Petition Date, the majority of the Debtor's liabilities consist of secured indebtedness. None of the Debtor's indebtedness is or was publicly offered for sale or publicly traded.  The Debtor's debt obligations comprise the following principal components:

*a.    The Prepetition Credit Facility*

29.    The Debtor and Tilden Holdings (the "Borrowers") are parties to that certain Loan, Guaranty and Security Agreement, dated as of February 28, 2019 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Credit Agreement"), as borrowers, with (a) certain guarantors from time to time party thereto, as guarantors, (b) White Oak Global Advisors, LLC as administrative agent (in such capacity, and in its capacity as "Collateral Agent" under the Prepetition Intercreditor Agreement (as defined below), the "Prepetition Agent") and (c) several entities from time to time party thereto as Lenders (collectively, the "Prepetition Lenders" and, collectively with the Prepetition Agent, the "Prepetition Credit Facility Secured Parties"), under which the Prepetition Lenders provided term loans (the "Prepetition Credit Facility") to the Borrowers for the purchase of the Marshland Assets.  The Prepetition Credit Agreement granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Credit Facility Secured Parties, a senior, fully-perfected security interest in and continuing lien on substantially all of the Debtor's assets and property, including cash

---

[5]    Under the Prepetition Credit Agreement (as defined herein), the Debtor was required to raise post-closing equity in Tilden Holdings in three rounds in the aggregate amount of at least $10.4 million. The amount of post-closing equity actually raised fell short of this threshold, resulting in an event of default under the Prepetition Credit Agreement.

collateral, subject to certain limited customary exclusions (the "Prepetition Collateral") to secure the Prepetition Credit Facility indebtedness (the "Prepetition Credit Facility Liens"). As of the Petition Date, the Prepetition Credit Facility Secured Parties consisted of White Oak Global Advisors, LLC and certain of its affiliates (collectively, "White Oak")

30.    The Prepetition Credit Facility provided for an original commitment amount of $32.0 million with a scheduled maturity date of February 23, 2023. These loans bear non-default interest at 6.00% plus the greater of (i) 2.00% *per annum* and (ii) the LIBOR Index Rate in effect on such day (the "Base Rate"), and bear default interest at the sum of the Base Rate plus 300.00 basis points *per annum* (the "Default Rate"). The Prepetition Credit Agreement has been amended seven times, including to allow the Prepetition Credit Facility Secured Parties to make five Protective Advances to the Debtor to provide additional liquidity for its operations and to fund the preparation and filing of this Chapter 11 Case, in an aggregate amount of $2,300,000, including (a) a Protective Advance in the initial principal amount of $900,000.00, pursuant to that certain *Third Amendment to Loan, Guaranty and Security Agreement*, dated as of April 29, 2021, (b) a Protective Advance in the initial principal amount of $500,000.00, pursuant to that certain *Fourth Amendment to Loan, Guaranty and Security Agreement*, dated as of August 9, 2021, (c) a Protective Advance in the initial principal amount of $350,000.00, pursuant to that certain *Fifth Amendment to Loan, Guaranty and Security Agreement*, dated as of November 4, 2021, (d) a Protective Advance in the initial principal amount of $300,000.00, pursuant to that certain *Sixth Amendment to Loan, Guaranty and Security Agreement*, dated as of December 20, 2021, and (e) a Protective Advance in the initial principal amount of $250,000.00, pursuant to that certain *Seventh Amendment to Loan, Guaranty, and Security Agreement*, dated as of January 26, 2022. The interest rate for the Protective Advances is the Default Rate plus 200.00 basis points *per annum*.

31.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Credit Agreement is approximately $35 million, inclusive of the $2,300,000 in Protective Advances. Since October 2020, the Debtor has not paid (and the Prepetition Lenders have not received) any cash interest under the Prepetition Credit Facility.

b.       *The Prepetition Swap Claim*

32.       The Debtor and Tilden Holdings were also parties to that certain *2002 ISDA Master Agreement*, dated March 5, 2019 (including the schedules, exhibits and annexes thereto, and all confirmations and transactions entered into or novated thereunder, other than in respect of the delivery of physical products (in each case, as amended, restated, supplemented or otherwise modified from time to time), the "Prepetition Swap Agreement" and, together with the Prepetition Credit Agreement, the "Prepetition Secured Documents"), with BP Energy Company ("BP" or the "Prepetition Swap Counterparty" and, together with the Prepetition Credit Facility Secured Parties, the "Prepetition Secured Parties"), under which the Prepetition Swap Counterparty agreed to enter into one or more rate swap transactions, credit derivative transactions, forward rate transactions, commodity swaps and similar transactions governed by the Prepetition Swap Agreement.  The Prepetition Swap Agreement granted to the Prepetition Agent, for the benefit of itself and the Prepetition Swap Counterparty, a senior, fully-perfected security interest in and continuing lien on the Prepetition Collateral to secure the Debtor's obligations under the Prepetition Swap Agreement (the "Prepetition Swap Liens" and, together with the Prepetition Credit Facility Liens, "Prepetition Liens").  BP terminated the Prepetition Swap Agreement on September 28, 2021 and the Debtor estimates that BP has a secured claim against it in the amount of approximately $3.2 million.

33.       As more fully set forth in the Prepetition Secured Agreements and that certain *Intercreditor Agreement*, dated March 5, 2019, by and among (a) the Prepetition Agent, (b) the Prepetition Swap Counterparty and (c) the Prepetition Loan Parties (the "Prepetition Intercreditor Agreement"), the Prepetition Credit Facility Liens are *pari passu* with the Prepetition Swap Liens.

c.       *Trade and Miscellaneous Unsecured Debt*

34.       The Debtor estimates that as of the Petition Date claims of trade and miscellaneous unsecured creditors total approximately $11 million.

## II.   EVENTS LEADING TO FILING THE CHAPTER 11 CASE

35.   A number of factors negatively impacted the Debtor's financial performance, ultimately leading to the Debtor having to seek relief under chapter 11.

### A.   Certain of the Debtor's Wells Did Not Perform as Projected and the Debtor Was Unable to Obtain Financing for Additional Wells.

36.   As mentioned above, the Debtor funded the acquisition of the Marshland Assets and the Gathering System with a combination of approximately $32.0 million in debt financing, $20 million from proceeds of the concurrently sold Gathering System, and $3.0 million in equity financing (with subsequent equity financing raised post-closing).   Following these transactions, the Debtor spent a significant amount of capital completing five drilled but uncompleted wells (known in the industry as "DUCs").   These wells did not perform as projected, however, in part due to three of the wells being spaced too closely together which caused the wells to interfere with each other.   Further, the Debtor was unable to drill two additional wells as originally contemplated.   Accordingly, the Debtor was unable to meet its production obligations under the UGI Agreement.

### B.   The Debtor's Obligations Under the UGI Agreement and the Events Leading to the Renegotiation of Same.

37.   In connection with the acquisition of the Marshland Assets and the Gathering System, UGI and the Debtor entered into the UGI Agreement whereby UGI committed

to redeliver the Debtor's gas through the Gathering System.  The terms of the UGI Agreement ultimately proved unworkable for the Debtor, as described below.

38.   <u>Minimum Volume Commitments</u>.  Under the UGI Agreement, the Debtor is obligated to meet certain "minimum volume commitments" (or MVCs) — an obligation that compels the Debtor to produce a fixed amount of gas each month.  Failure to meet MVCs results in the Debtor incurring a "shortfall" fee ("<u>Shortfall Fee</u>").  The Debtor's limited production capacity resulting from its completed but underperforming wells, and its lack of the two additional wells made it particularly difficult to meet the MVCs.

39.   <u>Other Fees</u>.  The Debtor is also obligated under the UGI Agreement to satisfy a number of other fees and charges, including capital recovery fees ("<u>Capital Recovery Fees</u>"), gathering fees ("<u>Gathering Fees</u>"), and compression fees ("<u>Compression Fees</u>," and together with the Shortfall Fees, the Capital Recovery Fees, and the Gathering Fees, the "<u>Fees</u>").  The Capital Recovery Fees are reimbursements for the buildout of extensions to the Gathering System that are made to accommodate new drilling.  The Compression Fees are charges incurred for the Debtor's use of compressor stations which increases the pressure of the gas that flows through the Gathering System, allowing gas to flow to downstream pipelines.  The Gathering Fees are payment for the collection and transportation of the gas through the gathering pipelines.

40.   The Capital Recovery Fees, the Gathering Fees, and—most importantly— the MVCs escalate annually.[6]  Thus, if gas prices suffer a sustained depression or production levels fail to meet the MVCs, the Debtor quickly falls behind on its obligations under the UGI Agreement, which has a domino effect on its ability to meet its other contractual obligations.

---

[6]   The MVCs escalate each year for the first three years of the UGI Agreement and then, after the tenth year, are extinguished.

41.     <u>Set-Off Rights</u>.  Under the UGI Agreement, UGI purported to have a right to set-off (or "net out") amounts owed to it from the proceeds of the sale of the Debtor's gas.  In practice, this meant that after delivering and selling the Debtor's gas, UGI would net out amounts owed to it on account of the Fees and remit to the Debtor only the remaining sum.  As discussed further below, the set-off arrangement was another factor leading to the Debtor's decision to shut-in its wells.

42.     <u>Dedication</u>.  The UGI Agreement also includes a purported restrictive covenant (the "<u>Dedication</u>") requiring the Debtor to port all the gas it produces in a designated geographic region exclusively through the Gathering System, which applies to all but one of the Debtor's wells.  This Dedication is purported to run with the land and to be binding on the Debtor's successors, which limits the Debtor's ability to operate with an alternative midstream services provider or market its assets to potential buyers.

43.     In sum, the Debtor's contractual obligations put the company in a precarious position within a few months from its inception, particularly in light of the volatility of gas prices.  These company-specific difficulties were exacerbated by a sustained depression of gas prices, the nadir of which occurred in summer 2020.   As a result, the Debtor struggled to meet the MVCs and other commitments under the UGI Agreement, less than two years into a 20-year contract.  Since Shortfall Fees were netted out by UGI prior to remitting cash from sales to the Debtor, the Debtor was left with insufficient cash flow to support operations and service its debt.

44.     Beginning in 2020 and carrying into 2021, the Debtor started to default on its obligations under the Prepetition Credit Agreement.  In December 2020, and again in January 2021, the Debtor failed to pay accrued and unpaid interest.  In response, on January 28, 2021, the Prepetition Credit Facility Secured Parties sent the Debtor a certain *Notice of Exercise of Voting*

*Rights of Equity Interests* (the "Default Letter"), notifying the Debtor of the occurrence of certain events of default under the Prepetition Credit Agreement.  Given the events of default, on January 28, 2021, the Prepetition Credit Facility Secured Parties had the right under the Pledge and Security Agreement to appoint Sam Humphreys as the sole manager of the Debtor, who subsequently retained G2 and me to restructure the Debtor's business.

### C.   The Shut-In of the Debtor's Wells and the Exploration of Restructuring Options.

45.    To successfully restructure the Debtor's business and to make it viable as a going-concern, it was paramount to renegotiate the UGI Agreement.

46.    Throughout 2021, the Debtor, as well as the Prepetition Credit Facility Secured Parties, sought to engage in good faith with UGI regarding an amendment to the UGI Agreement.  These efforts were unsuccessful.

47.    On June 30, 2021, with negotiations ongoing but absent a resolution. and with UGI continuing to exercise its set-off rights related to Shortfall Fees such that no gas proceeds were remitted to the Debtor (*i.e.*, gas proceeds were less than the Fees owed to UGI for that month), the Debtor shut-in all its wells connected to the Gathering System, ceasing substantially all of the Debtor's operations.

48.    While many of the Debtor's assets were shut-in, the Debtor engaged in ongoing strategic review of its options for resumption of operations (including by engaging an outside consultant), in light of, among other things, market circumstances and the Debtor's legal obligations under the UGI Agreement and other agreements.

49.    Also following the shut-in, beginning in July 2021, the Debtor began exploring potential in-court restructuring options.  On August 2, 2021, the Debtor retained Morris, Nichols, Arsht & Tunnell LLP as lead restructuring counsel to assist the Debtor in all aspects of its restructuring efforts, including potentially filing a bankruptcy case.

50.    In September 2021, Rockdale, the entity that shares employees and management with the Debtor, filed a jointly administered chapter 11 case in this Court, Case No.

21-22080.   As mentioned above, Rockdale's midstream services provider is also UGI.   In its bankruptcy case, Rockdale sought rejection of the UGI contract and pursued a 363 sale.   On December 14, 2021, Rockdale and UGI entered into a stipulation whereby UGI, Rockdale, and Repsol Oil & Gas USA, LLC, the purchaser of Rockdale's assets, entered a term sheet for an amended gathering agreement with UGI.

51.     Following these developments and in the months and weeks leading up to the Petition Date, the Debtor engaged in extensive negotiations with the Prepetition Credit Facility Secured Parties and UGI.   These negotiations ultimately culminated in obtaining DIP Financing from the Prepetition Credit Facility Secured Parties to pursue the Restructuring Transaction, and led to the Debtor and UGI entering into the Term Sheet.

## III.   THE DEBTOR'S CHAPTER 11 STRATEGY AND SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

### A.     The Debtor Will Seek a Purchaser for its Assets in Connection with a 363 Sale and Will Accept Bids in the Form of Plan Sponsor Proposals

52.     The Debtor and its advisors are ready to commence a robust marketing process for plan sponsors or purchasers to maximize value for creditors and to facilitate the Debtor's emergence from this Chapter 11 Case.   During this Chapter 11 Case, the Debtor intends to pursue the Restructuring Transaction to maximize the value of the estate, and will accept bids in the form of either a purchase of the Debtor's assets or as a plan sponsor proposal, resulting in either an asset sale restructuring, whereby the Debtor will enter into a sale transaction for the sale or disposition of the Debtor's assets, or a plan of reorganization.   Permitting the Restructuring Transaction to take the form of either an asset sale or plan of reorganization provides the Debtor with the latitude necessary to negotiate the precise terms of its ultimate emergence from chapter 11.

53.     To pursue the Restructuring Transaction, the Debtor retained Petrie Partners Securities, LLC ("Petrie"), immediately prior to the Petition Date.  In consultation with Petrie, the Debtor is developing a list of potential purchasers or plan sponsors.  Shortly, the Debtor and Petrie will begin distributing a teaser to prospective purchasers, sponsors, and lenders, and soon expect to start executing confidentiality agreements.  Petrie and the Debtor will work with all interested parties, provide necessary diligence materials, and will continue to actively seek potential interested purchasers, sponsors, and lenders.

54.     Having the option to accept bids in the form of a purchase of the Debtor's assets and or a plan sponsor proposal provides the Debtor flexibility to pursue a Restructuring Transaction in the form that best maximizes value for the Debtor's estate and recovery to creditors.

**B.     The Debtor's Chapter 11 Strategy is to Sell Substantially All its Assets or Emerge from Bankruptcy with an Amended, Viable UGI Agreement.**

55.     As described above, the Debtor has struggled to meet its obligations under the UGI Agreement.  As such, amending the UGI Agreement is a key component to a successful restructuring of the Debtor's business.

56.     To that end, prior to the Petition Date the Debtor was engaged in good-faith, arm's-length negotiations with UGI concerning restarting the Debtor's operations and modifying the UGI Agreement on a go-forward basis.  The fruits of these negotiations are the Term Sheet, which permits the Debtor to restart operations during the pendency of this Chapter 11 Case, and the Bidding Term Sheet, which will serve as a baseline for amending the UGI Agreement after the consummation of a Restructuring Transaction.  As part of the marketing process, the terms of the Bidding Term Sheet will be subject to negotiations between UGI and potential purchasers or plan sponsors.  The Debtor anticipates that a bidder or plan sponsor that prevails will most likely acquire the Debtor's business with an amended UGI Agreement in-hand.

57.     Through this marketing process, the Debtor, in consultation with its advisors, will work with UGI to sell its assets to a bidder or emerge from this Chapter 11 Case, in each case with a viable, amended UGI Agreement that will benefit the Debtor, its estate, its creditors, and all other parties in interest.

**C.     The Relief Requested in the First Day Motions is Necessary for this Chapter 11 Case to Succeed.**

58.     Concurrently with the filing of its chapter 11 petition, the Debtor has filed a number of motions identified herein requesting "first day" relief (the "First Day Motions").[7] The Debtor requests that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into—and stabilizing and facilitating the Debtor's operations during the pendency of— this Chapter 11 Case.  A list of the First Day Motions is set forth below:

a.     *Debtor's Emergency Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures, Including Omnibus Hearing Dates and Times*;

b.     *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*;

c.     *Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to (I) Maintain its Cash Management System and Pay Bank Fees, (II) Waive Certain U.S. Trustee Requirements, and (III) Continue Using Existing Checks and Business Forms, (B) Authorizing and Directing the Debtor's Banks to Honor all Related Payment Requests, (C) Scheduling a Final Hearing, and (D) Granting Related Relief*;

d.     *Debtor's Emergency Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent for the Debtor* Nunc Pro Tunc *to the Petition Date*;

---

[7]     Capitalized terms used but not defined in this section are defined in the applicable First Day Motions.

     e.     *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay or Honor Prepetition and Postpetition (A) Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests; and (B) Production Expenses; and (II) Granting Related Relief;*

     f.     *Debtor's Emergency Motion Pursuant to Sections 105(a), 363(b), 363(c) and 1107(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h) for Interim and Final Orders Authorizing the Debtor to (I) Continue Insurance Policies and Agreements Relating Thereto, (II) Honor Certain Prepetition Obligations in Respect Thereof, (III) Renew, Revise, Extend, Supplement, Change or Enter Into New Insurance Coverage as Needed in its Business Judgment, and (IV) Maintain the Surety Bonds; and*

     g     *Debtor's Emergency Motion for an Order (I) Approving the Term Sheet with UGI, and (II) Granting Related Relief.*

59.     I have reviewed each of the First Day Motions listed above, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtor's personnel and advisors.  I incorporate by reference the factual statements set forth in each First Day Motion as if set forth herein.

     a.     *Debtor's Emergency Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures, Including Omnibus Hearing Dates and Times.*

60.     The Debtor has filed a motion (the "<u>Case Management Motion</u>") to establish certain case management procedures that will apply to this Chapter 11 Case, including approving a service list.  By approving and implementing certain case management procedures and approving a service list, the Debtor believes that the administration of this Chapter 11 Case will be streamlined and the burden upon the Court will be reduced.  As set forth in the Case Management Motion, the Debtor has used Local Form 58 as the baseline for its proposed order.  To assist the Court and parties in interest with evaluating the proposed order, attached to the Case Management Motion is a redline reflecting the differences between the proposed order and Local Form 58.

      b.     *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief.*

61.    The Debtor has filed a motion (the "<u>DIP Motion</u>") seeking entry of an interim order (the "<u>Interim DIP Order</u>"):

(i)    authorizing the Debtor, subject to the restrictions set forth in the Interim DIP Order, to obtain senior secured postpetition financing ("<u>DIP Financing</u>") on a superpriority basis consisting of a senior secured superpriority credit facility;

(ii)    authorizing the Debtor to use the Prepetition Collateral, including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Documents, and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>") or the Debtor's use, sale, or lease of the Prepetition Collateral (including Cash Collateral), including, subject only to and effective upon entry of the Final Order (as in the DIP Motion), granting adequate protection claims and liens on Avoidance Proceeds;

(iii)    authorizing the Debtor to waive (a) subject to entry of the Final Order, its right to surcharge the Prepetition Collateral or Adequate Protection Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(iv)    waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to any of the Prepetition Collateral (including the Cash Collateral) and the Adequate Protection Collateral for the benefit of any party other than the Prepetition Secured Parties;

(v)    vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtor and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order and the Final Order (as defined in the Interim Order) and to deliver any notices of termination described below and as further set forth herein;

(vi)    approving the stipulations set forth in the Interim Order, subject to the terms and conditions set forth therein;

(vii)    authorizing the Prepetition Agent, acting at the direction of the Required Prepetition Lenders, to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

(viii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and the Final Order; and

(ix)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion.

62.    A summary of the material provisions of the Interim DIP Order may be found in the DIP Motion.

63.    The Debtor urgently needs to obtain DIP Financing to resume its operations, and to fund the administration of this Chapter 11 Case.  Absent the relief requested in the DIP Motion, the Debtor will not have sufficient liquidity to restart its operations, pay vendors of necessary goods and services, manage its assets and administer its restructuring.  All the foregoing expenditures are necessary to preserve the going concern value of the Debtor's estate.  Any delay in the Debtor's ability to access DIP Financing would irreparably harm the Debtor and its estate.

64.    I have provided a separate declaration in further support of the DIP Motion, attached as an Exhibit thereto.

65.    Accordingly, I believe that granting the relief requested in the DIP Motion is in the best interests of the Debtor, its estate and creditors, and parties in interest, and is essential to avoid immediate and irreparable harm.

c.    *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to (I) Maintain its Cash Management System and Pay Bank Fees, (II) Waive Certain U.S. Trustee Requirements, and (III) Continue Using Existing Checks and Business Forms, (B) Authorizing and Directing the Debtor's Banks to Honor all Related Payment Requests, (C) Scheduling a Final Hearing, and (D) Granting Related Relief.*

66.     The Debtor has moved (the "Cash Management Motion") for entry of interim and final orders: (a) authorizing the Debtor to (i) maintain its existing Bank Accounts and Cash Management System, including authorizing the Debtor to pay any undisputed prepetition Bank Fees and any postpetition Bank Fees in the ordinary course of business; (ii) waive certain requirements of the U.S. Trustee Guidelines; and (iii) maintain existing Business Forms and checks; (b) authorizing and directing the Banks to honor all related payment requests; (c) scheduling a final hearing within approximately 21 days of the commencement of this chapter 11 case to consider approval of the Cash Management Motion on a final basis; and (d) granting related relief.

67.     In the ordinary course of business, the Debtor manages its cash, receivables, and payables through an integrated cash management system (the "Cash Management System"). The Debtor uses its Cash Management System to efficiently collect, transfer, concentrate, and disburse funds generated from its operations.  The Cash Management System also enables the Debtor to monitor the collection and disbursement of funds and the administration of its bank accounts.  The Debtor maintains accounting controls with respect to each of its bank accounts and is able to accurately trace the funds through its Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.   To that end, the Debtor reconciles its books and records and produces a financial statement on a monthly basis.

68.     The Debtor will maintain its books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, the Debtor will be able to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of its bankruptcy estate and for all parties in interest.  Authorizing the Debtor to continue to operate using its Cash

Management System, as well as granting the other relief requested in the Cash Management

Motion, is critical to enabling the Debtor to effectively transition to operating as a chapter 11

debtor in possession and to preserve its business operations.

69.     Failure to receive such authorization and other relief within the first 21

days of this this Chapter 11 Case would severely disrupt the Debtor's management of its assets

and significantly impact the Debtor's ability to reorganize swiftly and efficiently.  As such, the

relief requested is necessary in order for the Debtor to manage its assets in the ordinary course

and preserve the ongoing value of the Debtor's operations and maximize the value of its estate

for the benefit of all stakeholders.

> d.     *Debtor's Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent for the Debtor* nunc pro tunc *to the Petition Date*.

70.     The Debtor has requested approval to retain Epiq Corporate Restructuring,

LLC ("Epiq"), as claims and noticing agent (the "Claims and Noticing Agent") for the Debtor in

lieu of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania,

effective *nunc pro tunc* to the Petition Date.  The Debtor anticipates that there will be in excess of

700 entities to be noticed in this case.  In view of the number of anticipated claimants and the

complexity of the Debtor's business, the Debtor submits that the appointment of Epiq as the Claims

and Noticing Agent is both necessary and in the best interests of the Debtor's estate and its

creditors because the Debtor will be relieved of the burdens associated with noticing services.  The

Debtor selected Epiq to serve as Claims and Noticing Agent after soliciting offers from two other

claims and noticing agents and determining, in its reasonable business judgment, that Epiq's offer

was the best deal for the Debtor and its estate.  Accordingly, the Debtor seeks approval of Epiq's

retention as Claims and Noticing Agent to permit the Debtor to devote its full attention and

resources to maximize value for its stakeholders and facilitate the orderly administration of this

Chapter 11 Case.

> e. *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay or Honor Prepetition and Postpetition (A) Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests; and (B) Production Expenses; and (II) Granting Related Relief.*

71.    The Debtor seeks the entry of interim and final orders authorizing the

Debtor to pay or honor, in its sole discretion, prepetition and postpetition obligations (i) to the

holders of royalty interests, overriding royalty interests, and working interests, and (ii) incurred in

connection with the development, maintenance, and operation of the oil and gas leases and wells

in which the Debtor has an ownership interest.

72.    Payment of Royalties, overriding royalty interests, amounts due to Working

Interest Owners, and Production Expenses (collectively, the "Production Obligations") is critical

to the Debtor's ability to reorganize. If the Debtor fails to satisfy the Production Obligations, its

ability to operate its wells on a go-forward basis would critically diminished, severely harming the

estate. Maintaining the Debtor's oil and gas leases is of paramount importance for this case. The

revenues the Debtor will derive from its oil and gas properties represent the bulk of the going

concern value around which the Debtor is reorganizing.  Satisfaction of the outstanding Production

Obligations and payment of same as they come due is in the best interest of the Debtor, its estate,

and all stakeholders.

73.    I am familiar with the relief sought in this motion and believe that the relief

sought: (i) will enable the Debtor to manage its assets with minimal disruptions, (ii) is critical to

the Debtor's restructuring efforts, and (iii) best serves the interests of the Debtor's estate and

creditors. It is my belief that the relief sought in this motion has been narrowly tailored to achieve the goals identified above.

      *f.*      *Debtor's Motion Pursuant to Sections 105(a), 363(b), 363(c) and 1107(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h) for Interim and Final Orders Authorizing the Debtor to (I) Continue Insurance Policies and Agreements Relating Thereto, (II) Honor Certain Prepetition Obligations in Respect Thereof, (III) Renew, Revise, Extend, Supplement, Change or Enter Into New Insurance Coverage as Needed in its Business Judgment, and (IB) Maintain the Surety Bonds.*

74.     The Debtor has moved (the "<u>Insurance Motion</u>")  for entry of interim and final orders authorizing, but not directing, the Debtor to (i) maintain the existing insurance policies (the "<u>Insurance Policies</u>") and to pay on an uninterrupted basis all premiums, brokerage fees, deductibles and administration fees (collectively, the "<u>Insurance Obligations</u>") arising thereunder or in connection therewith, including any Insurance Obligations for prepetition periods; (ii) renew, revise, extend, supplement, change or enter into new insurance policies as needed in its business judgment without further order of the Court; (iii) continue certain surety bonds (the "<u>Surety Bonds</u>") and pay all premiums, commissions, credit support and other prepetition obligations for the Surety Bonds (collectively, "<u>Surety Obligations</u>"), whether arising prepetition or postpetition, and (iv) renew or potentially acquire additional bonding capacity (as needed) in the ordinary course of its business, and execute other agreements in connection with its Surety Bonds and the Debtor's insurance program generally.

75.     By the Insurance Motion, the Debtor also requests that the Court: (a) authorize and direct any and all banks with which the Debtor maintains accounts that the Debtor uses to make payments related to the Insurance Policies, the Insurance Obligations, the Surety Bonds, and the Surety Obligations to receive, process, honor and pay all checks drawn on such accounts and fund transfers for payments with respect to the Insurance Policies and the Insurance

Obligations whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments; and (b) authorize the Debtor to issue new postpetition checks or effect new postpetition fund transfers on account of the Insurance Policies, the Insurance Obligations, the Surety Bonds, and the Surety Obligations and to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

76. Expedient payment of the Insurance Obligations and maintenance of the Surety Bonds is essential to preserving the value of the Debtor's business, property and assets. Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal. Thus, maintenance of the Insurance Policies and the Surety Bonds is necessary to comply with the Bankruptcy Code and to successfully administer the Debtor's Chapter 11 Case. Additionally, if the Insurance Policies are allowed to lapse or the Debtor does not pay the Insurance Obligations, the Debtor would be exposed to substantial potential liability for any damages or loss resulting to persons and/or property of the Debtor and others. It is essential to maximizing the value of this estate that Insurance Obligations be paid on a timely basis.

g. *Debtor's Emergency Motion for an Order (I) Approving the Term Sheet with UGI, and (II) Granting Related Relief.*

77. The Debtor has moved for approval of the Term Sheet (the "<u>Term Sheet Motion</u>") authorizing the Debtor to restart its operations consistent with the terms of the Term Sheet.

78. Authorizing the Debtor to enter into and perform under the Term Sheet is essential to the value of the Debtor's business and vital to the success of this Chapter 11 Case. By suspending the Minimum Volume Commitments in the UGI Agreement, the Term Sheet provides

the Debtor with a pathway to restart profitable operations, which will not only generate needed cash flow, but also illustrate the viability of the Debtor's business and aid in the marketing process.

79.    If the Term Sheet Motion is denied, the Debtor will face immediate and irreparable harm.  If the Debtor is not authorized to enter into the Term Sheet, it will be unable to restart operations and will be deprived of cash flow during this Chapter 11 Case.  Further, the DIP Financing is premised on a budget that assumes operations will restart and produce cash flow for the Debtor.  Approval of the Term Sheet Motion is both a condition to borrowing under the DIP Facility and a milestone thereunder.  If the Term Sheet is not approved, the Debtor will default under the DIP Credit Agreement and this Chapter 11 Case will likely either be dismissed or converted to a chapter 7 liquidation, destroying value for the Debtor's estate and all parties in interest.

80.    The Term Sheet is a product of extensive good-faith, arm's-length negotiations between the Debtor and UGI, and its approval will maximize value for the Debtor, its estate, and all parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 4, 2022
Boston, Massachusetts

*/s/ Jeffrey T. Varsalone*
Jeffrey T. Varsalone
Chief Restructuring Officer